Good morning, Your Honors, and may it please the Court. My name is Tarak Inada, and I represent the appellant Westfeldt Brothers. We are here today to talk about a case in which an Iowa company and the non-Iowa company that purchased it improperly entered into and executed a plan to specifically injure a Louisiana company. In doing so, the two companies engaged in substantial tortious conduct and violated the laws of numerous jurisdictions. In light of the substantial evidence of this misconduct presented to the District Court, I ask this panel to overturn the District Court's dismissal of Westfeldt's counterclaims on summary judgment and pursuant to Rule 12b-6, and also reverse certain choice of law determinations made by the District Court along the way. Now, the District Court has, this is a judge with almost 30 years of federal trial court experience. I lost count of how many reversible errors, in fact, the Court made. Have you got a count for me? The main reversible errors that we're arguing today is the choice of law determinations with respect to Westfeldt's breach of contract claims as well as their successor liability claims, and then also her interpretation of Iowa law, even if Iowa law did apply. So there's three main ones, and then there's some ... How many? How many do you think we have to discuss? I think about eight, Your Honor. So we have eight reversible errors by one of the most experienced district judges in the circuit. I agree that it sounds ... That is almost unheard of. It sounds unheard of, but if you'll let me get into it a little bit, I think I can make a case. I hope you're not going to cover all 11. We won't have time, Your Honor. I want to address one thing right up front. I'm going to be asking this panel to apply the Louisiana law of successor liability to a transaction in which an Iowa company was purchased by a company located in Missouri. I will admit that at face value, it sounds a little bit absurd to apply Louisiana law to that. However, under the very unique facts of this case, and given that the primary real world effects of this asset sale were felt in Louisiana with the defendants fully intending for that to be the case, I will argue to you that Louisiana has a superior interest in having its law applied. One of the facts ... What happened to the U.S. Roasteries Corporation, corporate entity? I didn't see that anywhere in the briefs. Well, all of its assets were purchased by Mid-America, one of the defendants, and then if I understand correctly, the U.S. Roastery entity sat as a shell entity with no assets for some period of time, and I believe was ultimately dissolved. And most dissolution statutes, I'm sure Missouri included, or Iowa included, have dissolution restraints or limitations, restrictions, requirements that allow creditors otherwise left to lurch with a cause of action. Did your client assert that against the USR? No, my client asserted it. The successor liability claim under the law of Louisiana against the successor company and also in the alternative pled that claim under Iowa law, which we believe would have been ... You asserted no claim against the asset selling company? Not in this action. There was another ... Whose corporate existence continued? There was another ... Not in this civil action, Your Honor. Anywhere? Yes, our client did institute an action against U.S. Roastery in a Louisiana district court proceeding that was not part of this case and was ultimately resolved. Is that in the record on appeal? We have not appealed the ... No, no, no. Can we get the facts of that litigation, which strikes me as potentially relevant to your argument on choice of law? The facts are mentioned in the papers that were filed with the Missouri district court. I don't know that a detailed record was entered into the record, but I'm prepared to answer any specific questions you may have about that case. If it's not in record on appeal, I don't have any questions. On your choice of law question for successor liability, it seems to me that most of the factors are sort of awash, but the one that I think hurts you the most is sort of where all the events are centered, because the coffee and the business were all in Iowa. When you're talking about successor liability, you're talking about sort of where the assets were, what the company bought. What's your best response to the fact that this shouldn't be in Iowa because of that where the events is centered element? Two arguments, Your Honor. The first one is that the primary real world effects of this asset sale were felt in Louisiana, which all parties to the asset sale knew were going to be the case, and evidence of that is in the record. We've cited numerous cases where despite the assets that were purchased being physically located in one of the defendant's jurisdictions, the court has still applied a different law because the court recognized the real world effects of the asset transaction were felt in a different state. It's a unique scenario, and this asset sale is very different than a typical asset sale. Tell me why that is. If the coffee and the business's assets are in Iowa, why is it felt in Louisiana, the real world effects? Well, the company MidAmerica Roastery, during its due diligence phase, looked into this noted that this transaction would not make sense with this massive debt to Westphal, but otherwise they were very interested in this. So literally the sole purpose of this transaction was to create a new company with a different name that had one difference, to wipe away this multi-million dollar debt to a Louisiana company. So that is what I will argue was the most significant real world effect. Why does this happen to unsecured creditors? I want to say all the time, it's certainly not uncommon. A secured creditor ultimately enforces its rights in a way that simplifies the avoidance of a fight with the unsecured creditors who are going to lose in bankruptcy anyway. I would submit that the way it was done in this case is extremely unique. We've put in evidence of what I would refer to as fraud being associated with the asset sale. Two specific examples was MidAmerica was completely controlling U.S. Roastery prior to the asset sale, in the pre-acquisition period. During that pre-acquisition period, U.S. Roastery was essentially already, the employees of U.S. Roastery were already working for Renoko. That's in the record by both MidAmerica managers and U.S. Roastery managers. Who was working, employed by Renoko? Correct. The predecessor company was U.S. Roastery. During the pre-acquisition period, both the president of U.S. Roastery and the CFO of U.S. Roastery, who both later became the president and CFO of MidAmerica. You said they were employed by Renoko? Effectively, yes, your honor. Effectively, yeah. Effectively. That's the whole point. There's a big difference between employment and alleged effective employment. Well, I would argue, your honor, I agree with you. I assume they weren't paid by Renoko. I assume that no FICA taxes were held by Renoko for them, and so forth. You are 100% correct. I will argue that in substance, they were already controlled and employed by Renoko, although not technically informed. Mergers and acquisitions. What's your best case for that? My best case for that would be the continuity of ownership requirement should be read flexibly. No, no, case. Federal circuit or state supreme court case. John Deere shared services versus success apparel. 2015 Westlaw 665-6932, Southern District of New York, 2015, as well as. Is it in your briefs? It is. I'll also cite Hankinson versus King for that same proposition. 117 F-SUP 3rd, 1068 District of Minnesota, F-2nd, 1163. What happened to the assets for U.S. Roastery after the deal was completed? Was it moved to Louisiana? Were the employees moved to Louisiana, or did everything remain in Iowa, factually speaking? Everything was roasted and sold by Mid-America in Iowa. But I understand exactly where you're going with that question. Under the restatement second's choice of law analysis on how they apply choice of law to successor liability, they kind of look at three scenarios. If it's a successor liability theory premised on an express assumption of liability, then the restatement counsels to use a contract choice of law analysis. However, if it's a successor liability argument premised on fraud, the restatement counsels to use a tort-based choice of law analysis. And if it's premised on mere continuation like this case, it rests, quote, somewhere in the middle. And that's from the Berg case written by Justice Alito. So tell me, though, if they bought assets that were in Iowa, if the assets remained in Iowa after the deal was over, You have a pretty big uphill battle to argue that some of the elements, the actions that were taken in Louisiana mean that we should apply Louisiana law. Am I wrong about that? I respectfully do think you're wrong about that, and let me explain why. The district court in this case used as the, quote, unquote, anchor for the successor liability analysis the asset sale entered into between U.S. Roastery and the successor company. What it should have used as the anchor for the choice of law analysis was the actual breach contracts that my client is suing over. Those are contracts entered in between Westfeld in Louisiana and U.S. Roastery, who is in Iowa. And under the restatements choice of law analysis for breach of contract cases, you use the local law of the state where under the terms of the contract, the seller is to deliver the chattel. In this case, and it's in the record at Appendix 58 and 159 to 235, that's Westfeld's appendix. The record evidence shows that the copper was consigned to U.S. Roastery in Louisiana. The risk of the coffee being damaged shifted to the purchaser, in this case U.S. Roastery, in Louisiana the moment it was loaded onto the shipping trucks that took it to Iowa. So because of that, it was actually delivered in Louisiana, and the restatement would counsel for applying the law of Louisiana in that case. This is the $85,000 check transaction? Well, this is every batch of coffee that was delivered to U.S. Roastery that we're here for, including the $85,000 check, yes. Why is that relevant, though, the delivery when we're talking about the assets, we're talking about the purchase of assets that are in Iowa. So why is it relevant that before they purchased the assets, it was delivered from Louisiana? Because the contracts by which the coffee was delivered in Louisiana is what we're here about today. Those are the breach contracts, and under the case law we've cited in our brief, that should be the anchor point. The anchor point should not be... Again, what case involving asset acquisition, you know, an exception to the rule that the acquirer of assets does not acquire debts. What case ignores the asset acquisition agreement and focuses on the selling, the asset seller's prior contract transactions for choice of law purposes? No case completely ignores the asset sale agreement. Sure. Okay, the cases that predominantly use the contracts that are actually being sued upon as the anchor are Black Hills Molding v. Brandon Holdings. That's 2015 Westlaw 522-7834, District of South Dakota, 2015. IDT Telecom v. CVT Prepaid Solutions, 2009 Westlaw 520-5968, District of New Jersey, 2009. Schwartz v. Pillsbury, 969 Federal 2nd 840, 9th Circuit, 1992. And Chrysler Corp v. Ford Motor, 972 FSUP 1097, Eastern District of Michigan, 1997. And if I may quote from that case, while Indiana has an interest in seeing that its law governs asset purchase agreements entered into between two Indiana corporations, Ohio has a greater interest in seeing that Ohio law applies to its own citizens who may be affected by the legal implications of those agreements. And what were the underlying claims in those cases? Fraud. It was a mere continuation breach of successful liability case, Your Honor, just like this one. And the Berg case that we've cited from the 3rd Circuit in 2006, that's 435 F3455 written by Justice Alito. They announced certain principles. They have argued that that case counseled that a choice of law provision in an asset sale between predecessor and successor should not be used against a plaintiff who was not a party to that agreement. And I will point out that one of the specific things that the district court relied on in this case to ultimately apply Iowa law to all the successful liability claims was, in fact, the choice of law provision, picking Iowa law in an asset sale between USR and Mid-America, which West felt was not a party to. So I will argue that right there, there's reversible error in expressly considering that provision. But I want to quickly get to, even if Iowa law applies, there was still a genuine issue of material fact. This very circuit in Grand Labs versus MidCon Labs of Iowa, 8th Circuit, 1994. The site is 32 F3, 127, recognized an exception to the requirement of strict continuity and management, which is required under Iowa law. That's what this district judge found that we did not have, and that's why we lost on summary judgment. But that court expressly recognized an exception in cases where the successor's corporation's ownership and management is different in form but not in substance. My opponent will argue that that exception should be limited to situations where relatives are inserted as sham owners of the predecessor company. But nowhere in that Grand Labs decision does it limit it to that situation. In fact, that decision by the 8th Circuit says situations, plural, in which a successor corporation's ownership is different in form but not in substance, and absolutely does not limit it to relatives where they're sham owners. We believe that there was substantial evidence provided to the district court that there was, even if Iowa law applied, a continuity of management. There was a press release from both the CEO of Renoko and the president of MidAmerica saying the addition of this management team gives Renoko another platform. Council, again, this happens all the time in acquisition situations. A small business, a smaller competitor is acquired by a larger competitor, and its principles agree to stay on and continue running the show for a transition period for typically good compensation. That doesn't mean that there's an exception to successor liability principles. Not in and of itself. A continuity of management is typical, and that by itself doesn't carry the debt. The entity didn't die, USR. The new owners were previously independent. The former executive stayed on during a transition period, which is quite typical. I don't see where you've got anything all that unusual. Here's the atypical thing that happened in this case that distinguishes it from all other asset, all typical asset transactions. In this case, the CFO of U.S. Roastery, who later became the CFO of MidAmerica, in his declaration at Westfield's Record Appendix at 401, testified in detail that prior to the acquisition, MidAmerica, the purchasing company, was completely dominating and controlling U.S. Roastery, controlling their day-to-day actions, controlling their checkbook, and I mean literally controlling their checkbook. Well, but the district court addressed that in detail. They held that the employees of U.S. Roastery essentially had an obligation to quit rather than follow their imminent employer's directives, and I would argue that... An imminent employer is still an imminent employer. The executives of the not-yet-acquired company have a duty, probably a fiduciary duty, to the shareholders if it's publicly held. I would argue that... To continue to function appropriately and not sell out, so to speak, before the sale. So the fact that, yeah, I thought it was a good idea... Well, besides, I was going to ask you, on the $85,000 check, do you dispute that it was not... That the check was for a prior sale and delivery?  The $85,000 check, which your brief seems to highlight as an example of pre-acquisition control, because the imminent acquirer said, don't pay the check, but take the coffee. And the opposing counsel brief says that, wait a minute, that check was for a prior sale, which is consistent with my understanding that your client consistently declined to take purchase money security interest and always took payments, always credited payments against past sales. So it continued to be an unsecured creditor as to current sales. Now, have I got that all wrong? You're correct in that there was a contract entered into prior to the day that that $85,000 worth of coffee was released. However, it was only released on the express representation by Christopher Hodgson, who was directly controlled by Eric Bombal at that time, that a check with this tracking number was in the mail. And once Westfield had that information, that is why they released that particular batch of $85,000 worth of coffee and it would not have been released, but for that representation. Why did they keep selling after that though? Sue them for that shipment and quit supplying? That was the last shipment, your honor. And that shipment was litigated then as a standalone breach of contract or misrepresentation? There was a claim brought for that shipment in a different civil action, your honor. And what happened? Well, it's not in the record, but I can tell you, I mean, I was counsel in that action, but it's not in the record. Did it settle or did your client lose the claim that there was some kind of a fraud or misrepresentation and was entitled to rescind it? It settled. I see I'm out of time. If the court would grant me any time on rebuttal, I would reserve a minute or 30 seconds. Thank you very much. Good morning, your honor. May it please the court. The general rule of successor liability is that a corporation that acquires all or part of another corporation's assets does not also acquire its liabilities. There are exceptions to this general rule that are designed to make sure that someone who runs up a debt is not able to shed that debt and then continue to enjoy the benefits of the assets that the debt really should attach to. That fact pattern is completely absent in this case. The owner of U.S. Roastery in Des Moines, Iowa, was a man named Howard Fisher, and he lost his company. His company was in distress. He owed $5.2 million to Great Western Bank. Great Western Bank had a perfected security interest in that $5.2 million debt, and Great Western Bank foreclosed. And the bank sold the assets to my clients, Renoco and its sister company, MidAmerica. And in that sale, Renoco and MidAmerica were willing to pay $2.1 million to the bank. The bank was left with a shortfall on its secured debt of $3.1 million out of the $5 million it was owed by U.S. Roastery. Now we have, in this case, an unsecured creditor, Westfeldt, from Louisiana, saying that it should get in front of the secured creditor, Great Western Bank, and be made whole on the $3 million of unsecured debt that it was owed by this failed company. When companies fail, unsecured creditors are often left in the lurch. It happens all the time. There was nothing unique about this situation. And it's particularly unremarkable in a case such as this where the secured creditor, the secured lender, Great Western Bank, was left with a $3 million shortfall. At summary judgment, we submitted an affidavit from Great Western Bank in which the bank states that it was familiar with the financials of U.S. Roastery. It foreclosed on its security interest because U.S. Roastery was not paying its debts. And the bank sold those assets to Renolco and MidAmerica in a UCC Article IX sale because the bank felt that that was the best thing for the bank to do. What evidence, if any, in your view, was there on the claim that Renolco, or its new sub, coerced U.S. Roasteries into the default that Great Western Bank then acted on? There was no evidence of that in the record at all. Westfeld submitted- Would that make a difference? I don't think it would make a difference. There's a case from the Eighth Circuit called Noble Systems Corp. v. Alarica Central LLC. Judge Hamilton cited this case in her order. Judge Wolman wrote the opinion in this Noble case. In that case, the facts were that a company called ACI had entered into a licensing agreement, and as part of that licensing agreement, it granted a security interest to Noble. Noble failed to perfect the security interest. Then ACI, the debtor, as applied to this case, ACI would be U.S. Roastery. ACI then gets a line of credit with a company called Pandora, and Pandora perfects a security interest in that line of credit in that debt. Then Pandora pulls the line of credit. Now ACI is in trouble. Then ACI approaches the defendant in the Noble case, Alarica, and says, Would you like to buy our assets? Would you like to buy our company as a going concern? And Alarica is then approached by Pandora, who is the secured creditor of ACI. Pandora says, Hey, instead of buying, Pandora says, Instead of buying ACI as a going concern, why don't you buy it from us in a foreclosure sale? We're going to foreclose. So the facts of the case are closely analogous to what happened here. Pandora is the secured creditor that would be in the shoes of Great Western Bank. And the court finds that the defendant who bought the assets of ACI, pursuant to the foreclosure sale, that's the defendant in the case, Alarica. That defendant had no duty to buy ACI as a going concern, and it had no duty to rescue ACI's creditors. In that case, it was Noble who said it was owed this unsecured debt on the licensing fees that it was entitled to. And so the reasoning of the Noble case, I think, applies perfectly to this case. In this case, Renoco and MidAmerica owed no duty to U.S. Roastery to save the company. Renoco and MidAmerica looked at U.S. Roastery and considered buying it as a going concern, and then when they got into the financials, they saw all this debt that was owed. $5.2 million owed to Great Western Bank, secured. $3 million owed to Westveld, unsecured. Also, I think about another million dollars of debt owed to other unsecured creditors, vendors, suppliers. And Renoco and MidAmerica said, we're not going to buy this company with all this debt. And then the foreclosure happens. And then Renoco and MidAmerica buy the assets at the foreclosure sale. Under the Noble case, there's nothing wrongful about that. There's nothing fraudulent about that because there's no duty on the part of Renoco and MidAmerica to save the struggling company and to bail out the struggling company's creditors. What about the $85,000? Opposing counsel makes a lot out of that. And it does appear that if the facts are taken as true, that there was some perhaps bad behavior on your client's part. The facts concerning the $85,000 are that that was money that was going to be applied to U.S. Roastery's debt with Westveld from coffee that had been shipped, I think, about nine months earlier. The facts of summary judgment were undisputed that by 2012, U.S. Roastery owed $3 million to Westveld. This transaction, the sale agreement and the asset purchase happens in 2015. So from 2012 to 2015, that $3 million debt is floating along and U.S. Roastery is buying coffee from Westveld and it's sending payments to Westveld that are then applied to the oldest debt. So it was about a nine-month lag. So Judge Locum was right that that $85,000 was to pay for coffee that had been shipped months ago. When Westveld shipped coffee to U.S. Roastery in January 2015 in exchange for that $85,000 payment, Westveld actually had no expectation it was going to be paid for that coffee for nine months if the past practice held up. In fact, from 2012 to 2015, that $3 million debt actually whittled down by $125,000, and we showed that at summary judgment. So Westveld got exactly what it bargained for in this arrangement that it had with U.S. Roastery. U.S. Roastery was making payments, applied to the old debt, whittling away at that $3 million debt very slowly. So what Mr. Hodgson says in his declaration, and it's in Westveld's addendum starting at page 54, he says in paragraph 11 of his declaration, he says, On one occasion, after U.S. Roastery had already mailed a check for $85,000 to Westveld and provided Westveld with a confirmation number and a tracking number, Eric Bombal, Renoco's CFO, called me and learned that U.S. Roastery would not also be able to pay Renoco for coffee that Renoco was going to ship to U.S. Roastery. At this time, U.S. Roastery was getting coffee supplied by Westveld, as it had been for years, and then Renoco was going to send coffee to U.S. Roastery. And Renoco said, We're going to send you that coffee, but we want prepayment because we're not going to give it to you on credit because we know that you're struggling. So U.S. Roastery agrees to pay Renoco and to issue a stop payment on the $85,000 check that was already in the mail to Westveld. The reason that Mr. Hodgson did that, and Judge Hamilton explains this in her order, Renoco had no authority over U.S. Roastery at that time. The transaction had not occurred. There was no actual authority. What Mr. Hodgson describes is simply doing something that he felt was in his own best self-interest because he knew that Renoco was possibly going to buy the assets of U.S. Roastery and Renoco would be his future employer. So in paragraph 11 of his declaration, Mr. Hodgson says, Although I did not believe it was the right thing to do, I had no choice other than to follow the directive of my future employer, and I reluctantly complied and requested a stop payment on the check. So it is false to say that Renoco literally controlled the bank account of U.S. Roastery. There's no evidence of that. What Mr. Hodgson describes is a phone call where Mr. Bomball at Renoco says, We want to be prepaid for this coffee. And then Mr. Hodgson at U.S. Roastery, who does control the checkbook of U.S. Roastery, feels pressure and feels it's in his own best self-interest so he can pay his own mortgage that he go ahead and do what Renoco wanted, which was to pay Renoco first and to issue a stop payment. Well, in that passage you just read, it said, I had no choice but to do it. Doesn't that, taken in a light most favorable to the other party, indicate that there's some sort of control, whether it's implicit or otherwise, over? The issue, I think, is not control, but the term would be authority. Does Renoco have the authority to force U.S. Roastery to issue that stop payment? And the answer is no. Mr. Hodgson acted selfishly, in a sense, because he wanted to please someone who he thought was going to own U.S. Roastery in the future. He literally says, it's the directive of my future employer. That means that they are not his employer and there's no actual authority there. A few other items that Mr. Inada spoke about that I want to address. Mr. Inada mentioned the John Deere case and said that that's a case that supports Westfeldt's theory of successor liability. John Deere was a case analyzing New York law. We cite a case in our brief that says, really, the inquiry is, what is the successor liability of Iowa? Or if you choose to apply Louisiana law, then what's the successor liability law of Louisiana? Cases analyzing the successor liability of New York law really are not relevant. But what John Deere says is that at the dismissal stage, at the pleading stage, if the plaintiff pleads some continuing benefit that the debtor is realizing from the assets that are sold, then that continuing benefit might be sufficient to plead continuity of ownership. But at the dismissal stage, not at summary judgment. And that's exactly what happened in this case. Judge Hamilton denied our motion to dismiss the successor liability claims. And in a footnote in her order, she says, Westfeldt has a long way to go to prove that successor liability should attach here. But at the pleading stage, I'm going to let them survive. So that's all John Deere means. Mr. Inada mentioned Hankinson, which is a case from Minnesota. It applies Minnesota law. And it's a case about successor liability in the context of nonprofit corporations. And the court struggles with the definition of continuity of ownership because nonprofit corporations don't have owners. They don't have shareholders, stock and directors. And so the court is looking at who is really the owner of a nonprofit corporation for purposes of the continuity of ownership prong. And so that case, I think, really has no relevance. My colleague mentioned the Schwartz case, which is from the Ninth Circuit. It's a California case. In that case, the plaintiff, Schwartz, bought a Haagen-Dazs franchise, and they opened an ice cream shop in California. They sued Haagen-Dazs and its successor, Pillsbury, on theories of tort, fraudulent misrepresentations and omissions. And in Schwartz, the parties agreed that California law would apply to the question of whether Pillsbury was liable for the tort claims as the successor. There is no choice of law analysis that I could find in the Schwartz case. And it involves tort claims, which really involve different choice of law considerations than the contract claims that are at issue here. Mr. Inada mentioned Chrysler Corporation versus Ford Motor Company. That's a case from the Eastern District of Michigan. That is a tort case. The underlying claim was CERCLA. And so the court looked at where the facts of the case really were centered and found that in a CERCLA case, what you're concerned about is who's going to clean up this property, who polluted this property in the first place. And all of those things make the real-world effect in a CERCLA case really should be the location where the pollution and the cleanup are happening. And the court in Chrysler found that really tort choice of law rules would govern its analysis. So, again, Westfeld cites a number of tort cases to support its position, none of which we believe are illuminating here, because these are contract claims and there's no dispute about that. Finally, Westfeld mentioned Grand Laboratories, which is an Eighth Circuit case from 1994. It was cited by Judge Hamilton below. And the takeaway from the Grand Laboratories case is that it discusses the Iowa successor liability law, and it talks about a case called CMAQ Chambers from Iowa, which involved the owner of a taekwondo business who had amassed some debt. He formed a new corporate entity and he made his son the owner of it. And the court, under Iowa law, you need continuity of ownership for the mere continuation exception to the general rule against successor liability. So the court in CMAQ Chambers said, we're going to look past the fact that the owners are literally different, because it's the son of the man who ran up this debt. And then in Grand Laboratories, the Eighth Circuit looked at that CMAQ case and said, we believe that CMAQ stands for the unremarkable proposition that parties cannot circumvent the mere continuation exception by inserting relatives as sham owners and directors of a new company that is, in substance, the predecessor. The company would be different in form but not in substance, but we don't believe that will get you off the hook if you do that kind of thing. And then in a subsequent case called Pankratz, the Iowa Supreme Court looked back at the Eighth Circuit's analysis in Grand Labs and the previous case in CMAQ. And in Pankratz, the Iowa Supreme Court said, we think that CMAQ stands for the unremarkable proposition, or that CMAQ really is a fraud case because you're inserting a sham owner. It's not best understood as a mere continuation case because there literally was not continuity of ownership. It's more of a fraud case. Fraud is one of the exceptions to the general rule against successor liability. And so Grand Labs, I don't think, supports Westfeldt at all. In fact, it's quite to the contrary. Again, there was nothing unique about this transaction at all. The things that Westfeldt points to to allege that Ronoco came in and controlled U.S. Roastery are this $85,000 check that we've talked about. And then another thing that Westfeldt mentions is that U.S. Roastery could not talk about the impending asset sale. That's because there was a confidentiality clause in the party's agreement when they were doing due diligence. And so that's very common. And if you went with Westfeldt's argument, then the law would be that a company that enters into a confidentiality clause with another company effectively owns that company because it is controlling that company's ability to speak. That's not the law. There's no support for that. This is probably in the briefs, in which case I missed it. Are you aware of any case or cases that say that a purchaser of assets at a foreclosure sale has been deemed a successor? I'm not aware of that, Your Honor. That's what we have here. That's exactly what we have here. There's no other asset purchase agreement. That's right. And that's what we had in the Noble case. We had a foreclosure sale. There's no case in Iowa or Louisiana or any other jurisdiction that finds that successor liability attaches through a foreclosure sale where the owner of the debtor loses his company and acquires no ownership interest in the successor. And that's what happened here. At the summary judgment stage, Westphal was saying that there was continuity of ownership because Renoco effectively controlled U.S. Roastery before the transaction through the $85,000 check issue. And then after the transaction, there was continuity of ownership because Howard Fisher, who was the owner of the debtor, stayed on and essentially had a sales function. He had the title of president of the new entity, MidAmerica. He stayed on, I think, for a year and helped transition customers. So Westphal, at the summary judgment stage, was literally on both sides of the ownership issue. They said that Renoco showed continuity of ownership by being involved before and after the transaction. They said that Howard Fisher, the debtor, the owner of U.S. Roastery, that's where the continuity of ownership was because he was the owner before and then he continued to work for the company afterward. It was a totally inconsistent theory. It's a theory that their expert advanced, and Judge Hamilton was all over that in her order granting a summary judgment. Unless there are any further questions, I'll yield the remainder of my time. I know my time has expired, so I'll be brief, Your Honors. I'll give you a minute and a half. Okay, thank you. Here's one critical response. Yes, it is common for a confidentiality clause to be inserted into an asset sale whereby the predecessor company is not allowed to disclose the pending asset sale. However, it is uncommon, and I'll quote from Chris Hodson's declaration, that the successor company directed the predecessor to continue taking coffee from a creditor during the pre-acquisition period. When Renoco directed U.S. Roastery to continue taking coffee on credit, knowing that Westphal was never going to see a penny for that coffee, I believe that is a very uncommon scenario. I don't know of another case where the court has seen facts that are egregious. Pre-acquisition control. I know Your Honors are concerned that technically the managers of U.S. Roastery were not employed by Renoco during the time of the tortious conduct that I'm alleging. On page 31 of the deposition of Scott Meter, Scott Meter is the CEO of Renoco. That's Westphal Record Appendix at 410. Scott Meter actually testified that the deal closed a month or so prior to the actual finalization of the paperwork. It just took a couple months. What deal is this? The asset sale. The foreclosure sale? The asset sale by which Renoco purchased the assets of U.S. Roastery. I'm quoting from the CEO of Renoco. What authority was this? This is deemed a foreclosure. Was it a receivership, a bankruptcy? What sort of a foreclosure was it? It was an asset sale contract, and there were three parties to it. U.S. Roastery... The bank is controlling it. The bank is... It was a private sale under the bank's foreclosure. The bank was one of the three parties to the asset sale, and it's titled asset sale. But there were three parties. U.S. Roastery was a party to it as well. And I heard you ask, Mr. Comerford, have you ever heard of any case where a court has imposed successor liability when there's a foreclosure sale involved? And we have cited a case in our brief. I don't have the site for you, regrettably, right now, but it is in our brief. That foreclosure does not automatically negate the possibility of successor liability. And then I'll close with this final point. Mr. Comerford was distinguishing some cases because they were a successor liability premised in tort. Our claim is in part a successor liability premised in tort. We've argued for successor liability not only under the mere continuation exception, but also under the fraud exception and under the choice of law analysis that the Berg Court articulated under the second restatement for a successor liability claim premised in tort. You use the restatement's tort-based framework, and the district court used the restatement's tort-based framework to properly choose Louisiana law, which it actually applied to Westfeld's tort-based claim. So the district court did apply Louisiana law to some claims, being the tort claims. And we argue that for the purposes of the fraud exception, they should have used that same framework.  Thank you, Counsel. The case has been thoroughly briefed and well-argued. It's complex. We'll take it under invite.